### In re BULLIS.

(Supreme Court, Appellate Division, Fourth Department. January 7, 1902.)

1. BANKRUPTCY—RELEASE—FRAUD.

A., owning the stock of three railroads constructed for the purpose of reaching the timber on a large tract of land, and also owning certain tracts of timber land, and being desirous of obtaining financial aid in extending the system, falsely represented to certain bankers that the land was clear of incumbrances, contiguous to the line of road as constructed and projected, and covered by a large quantity of merchantable timber, which would provide the railroad with 70 tons of freight to the acre, at rates from 25 to 50 cents per ton. In a suit to compel A. to carry out his contract growing out of these representations, the court assumed jurisdiction, "by reason of the fraud practiced by" A., and "by the fact that plaintiff has been deceived by the fraudulent statements and misrepresentations of" A. It entered a judgment for damages, on default of specific performance. Held, that the judgment

was one in "an action for fraud," within Nat. Bankr. Law 1898, c. 3, § 17, subd. 2, excepting such judgments from release by a discharge in bankruptcy, the exception not being limited to common-law actions of fraud or deceit.

**2. SAME.**

That a judgment was in an "action for fraud," within Nat. Bankr. Law 1898, c. 3, § 17, subd. 2, excepting judgments from release by a discharge in bankruptcy, need not appear from the judgment itself, but may be gathered from the entire record in the case.

**3. SAME.**

Nat. Bankr. Law 1898, c. 3, § 17, provides that a discharge shall release the bankrupt from his debts, "except such as * * * (2) are judgments in actions for frauds, * * * or (4) were created by his fraud, embezzlement, misappropriation, or defalcation while acting as an officer or in any fiduciary capacity." *Held*, that the words "fraud," "embezzlement," and "misappropriation," in subdivision 4, refer to an officer or person in a fiduciary capacity, and not to the individual debtor referred to in subdivision 2.

Appeal from special term, Erie county.

In the matter of the application of Spencer S. Bullis, bankrupt, for discharge of judgments. From an order refusing application, petitioner appeals. Affirmed.

This proceeding was commenced by the petition of the appellant, which shows that he has been discharged from his debts in compliance with the national bankrupt law; that more than one year has elapsed since such discharge; that two judgments recited in the petition are docketed against him, and the motion for their cancellation and discharge is made pursuant to section 1268 of the Code of Civil Procedure. The judgment creditor opposed the motion, and the material facts contained in the record presented are set forth in the accompanying opinion.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and HISCOCK, JJ.

C. S. Cary and Adelbert Moot, for appellant.

C. Walter Artz, for respondent.

SPRING, J. The petitioner upon this motion was adjudicated a bankrupt September 19, 1900. There were two judgments entered against him in 1895, one of $3,586.40, and one of $341,745.65, and this motion was for the purpose of relieving the petitioner from the liability of these judgments. The judgment creditor contests the application, on the ground that the judgments were recovered by reason of the fraud of the said Bullis and one Barse.

The question before us involves the construction of subdivisions 2, 4, § 17, c. 3, of the national bankrupt law of 1898. Section 17, so far as applicable, provides:

"Debts not Affected by a Discharge.—A discharge in bankruptcy shall release a bankrupt from all of his provable debts, except such as * * * (2) are judgments in actions for frauds, or obtaining property by false pretenses or false representations, or for wilful and malicious injuries to the person or property of another; * * * or (4) were created by his fraud, embezzlement, misappropriation, or defalcation while acting as an officer or in any fiduciary capacity."

The action in which the judgments were rendered was not one at law for fraud and deceit, but was a suit in equity, and, in order to appreciate the situation, it becomes necessary to analyze the complaint and the decision of the court.

The allegations of the complaint, with the exhibits attached, show that on the 8th day of October, 1899, Spencer S. Bullis and Mills W. Barse owned the capital stock of three railroad companies, to wit, the Allegany & Kinzua Railroad Company, a corporation organized under the laws of Pennsylvania, a New York corporation of like name, and the Bradford & Corydon Railroad Company, also a Pennsylvania corporation. These railroad lines were constructed for the purpose of reaching the timber on a large tract near the Allegheny river. The combined length of the railroads at that time was 16 miles, but the length contemplated, with the radiating lines completed, was 30 miles. Said Bullis and Barse also owned 30,000 acres of timber land in McKean county, Pa., and also other tracts of timber land in that vicinity. They desired financial aid in the development of their scheme, and, on the date mentioned, entered into a written agreement with I. B. Newcombe & Co., a firm of New York bankers, and this agreement is designated "Schedule A, of Exhibit A." By the terms of this agreement said Bullis and Barse were to execute a trust mortgage or deed to the Central Trust Company of New York, as trustee, as security for first mortgage bonds to the amount of $250,000, bearing interest at 5 per cent., and payable 30 years from date. The said mortgage was to cover the properties and franchises of said railroad corporations, and also the said 30,000 acres of land. All of said property was to be under the management of a new corporation, capitalized at $250,000. The said bankers undertook to negotiate at par $210,000 of said bonds, and to pay over the avails to said Bullis and Barse, as the railroad was completed along in sections of five miles. The new corporation was to be managed by seven directors, three of whom were to be elected by said bankers; so that Bullis and Barse were to retain a majority in the management of the company. There are various other provisions in the agreement; for instance as to an option given to the bankers to purchase all the capital stock of the corporation at a fixed price, and that the real estate within the dominion of said corporation was to be "contiguous or tributary to one or the other of said several railroads, and they shall be timbered and profitable to said corporation," and that the new corporation should be organized, and the title transferred to it, and the trust instrument executed, and the bonds ready to be delivered, on or before January 1, 1890. A modification of said agreement was made by another contract entered into between the same parties on the 9th day of December, 1889. This agreement provided for the merger and consolidation of these railroads, with a capital stock of $500,000 at par value, and for the issue of a "first mortgage or deed of trust" upon all of the property of the corporation to said Central Trust Company of New York, as trustee, for $500,000, to secure gold bonds to that amount. The scheme designed by the modified agreement was the extension of the railroad lines to 70 miles, and the inclusion of 16,000 acres of additional timber land, thus bringing within the ownership of the new company 46,000 acres all told. By this agreement only $300,000 of the bonds issued were to be put upon the market at once, and they were to represent 46 miles of completed railroad. Newcombe & Co. undertook to dispose at par of $260,000 of this bond issue, to be used as

the road was completed and put in operation by sections of five miles, and in the manner set out at length in the second paragraph of the agreement. The time for the consummation of the agreement, by the transfer of the title, etc., was by this contract extended to February 1, 1890. Bullis and Barse were empowered to enter into a contract with the Interior Construction & Improvement Company for the purpose of causing the merger and consolidation of said several railroads, and to cause the construction and completion thereof into one connected system. Two agreements were, accordingly, on the 9th day of December, 1899, entered into by said construction company, one with the Allegany & Kinzua Railroad Company, which was owned by Bullis and Barse, and one with them individually, providing for the construction and consolidation of these railroads, and the contract outlined the manner in which the moneys arising from the bond issues were to be distributed, a large part of which was to be paid to Bullis and Barse, and also provided for the deposit of a certain amount with the trustees named. The complaint further charges that said Bullis and Barse "falsely and fraudulently pretended and represented to said firm of I. B. Newcombe & Co. that said tract of 30,000 acres to be conveyed was free and clear from all incumbrances, that all of said land was contiguous or adjacent to the line of said railroad, as the same was then constructed or surveyed and projected, and the said land was covered by a large quantity of merchantable timber, capable of yielding and producing 70 tons of freight in timber, lumber, and bark for each acre of land for transportation over said railroad." It is further alleged that in fulfillment of the said agreements the defendant railroad corporation, on the 1st day of February, 1890, executed "its first mortgage or deed of trust" to said trust company, conveying to it said railroad properties and franchises, and providing for an issue of bonds limited to $500,000, to be secured by said properties and the 46,000 acres of timber land to be conveyed by said Bullis and Barse to said trustee; "that the defendants Bullis and Barse caused said Bullis and Sarah E., his wife, to join with said railroad company in said mortgage," and that by said mortgage they assumed to convey to said trustee land contiguous to the line of said railroad, and free from incumbrances, and covered by a large quantity of merchantable timber, aggregating 30,954.10 acres, and which, by the terms of the said agreements, was to be a condition precedent to the issue of $300,000 of said bonds to be used in the building and completion of said 46 miles of said railroad; that, in reliance upon the conveyance of the said land, bonds to the amount of $300,000 were issued, and were sold by said Newcombe & Co., 10 of which were purchased by the plaintiff in the action; that all of the proceeds of the said bonds have been used in the construction of said lines and in the payment of prior liens upon the property and the said constituent lines, and that the defendant railroad company, which is the consolidated company, is wholly without funds, and that the extension thereof is essential to enable it to obtain money to meet its liabilities; that said Bullis and Barse refused to convey to said trustee the remaining 16,000 acres of such land, and to provide for the building of the balance of said railroad,

whereby the construction company is unable to proceed with its work of completing the same. The complaint further alleges that said 30,954.10 acres of land conveyed by Bullis and his wife were not free of incumbrances; that the same at that time were subject to prior liens, aggregating $159,000, besides interest; that $144,776.07 of said indebtedness still remain unsatisfied; that said land was not covered with merchantable timber, but was waste land, from which the salable timber had been removed, and that a large portion of the said land was not adjacent to the line of said railroad, and the timber thereon not accessible to be transported thereon; that a large portion of the land so assumed to be conveyed was not owned by either of the said defendants, and was not conveyed at all by said deed,—all of which facts the said Bullis and Barse "well knew at the time they made" said pretended conveyance, and said conveyance "is in reality false and fraudulent"; that, by reason of the "fraud and failure" of said Bullis and Barse to convey said land free of liens, "a great fraud has been committed" by them, which will cause irreparable injury to the bondholders, including the plaintiff, who is one of them, unless the performance of the said agreements and the conveyance of 30,000 acres of unincumbered timber land to said trustee are specifically decreed. The complaint further charges many derelictions of duty by said Bullis and Barse as directors of the said railroad corporation, and the diversion from their proper use "fraudulently and secretly" of steel rails and other properties belonging to said company, and they threaten further unlawful expenditures upon the credit and at the expense of the said company; that by reason of the unlawful acts of said Bullis and Barse the earning capacity of the company has been seriously impaired; that, pursuant to a provision in said trust conveyance providing for the release from the lien of the said mortgage of "any portion or portions of said timber land" upon payment of the value of the portions so released, to be ascertained by arbitrators appointed as the said conveyance provided, arbitrators were appointed, upon the request of Bullis and Barse, and appraised over 4,000 acres of said land at $1 per acre; that it is apparent therefrom that said Bullis and Barse "had perpetrated a gross fraud" upon said railroad company and upon the bondholders, as said land, if timber land, was of the value of $25 per acre. The complaint then asked for specific performance, "or that said defendants pay to said trustee, for the security of said bondholders, such a sum of money as the court shall ascertain to be equivalent to the value of said lands and real estate conveyed as aforesaid, which are not in conformity with the terms of said several agreements, and said bonds and the mortgage or deed of trust securing the same; and, in addition thereto, 16,000 acres of like timber land, in all respects similarly situated, and free from incumbrance, as security to authorize the issue of $200,000 of bonds, in said agreements specified and set apart for the construction of the 24 miles of railroad additional to the 46 miles above mentioned."

The complaint, therefore, is one in equity, demanding that the defendants comply with their several agreements, and charging that the defendants, in their attempted compliance therewith, falsely and

fraudulently foisted upon the trustee a conveyance which only apparently transferred the title to the large quantity of land described in it, and that this fictitious transfer was in pursuance of the fraudulent scheme on the part of the said defendants; and the complaint asked for money compensation in the event of the inability of the defendants to fulfill their undertakings.

A trial was had at a special term in New York county, and at the close of the evidence it appeared that Bullis and Barse were unable to perform specifically, and the court dismissed the complaint, declining to entertain jurisdiction for the purpose of awarding damages in lieu of strict performance. The judgment entered on this decision was reversed by the general term (O'Beirne v. Bullis, 80 Hun, 570, 30 N. Y. Supp. 588), and, upon an appeal taken by the defendant railroad company, this judgment of reversal was affirmed by the court of appeals (O'Beirne v. Railroad Co., 151 N. Y. 372, 45 N. E. 873). A new trial was had in the meantime upon the answers interposed by Bullis and Barse before Mr. Justice Barrett, and elaborate and explicit findings of fact were made by him, fully sustaining the charges contained in the complaint and upon which the allegations of fraud were based. The special term, among other facts, found that, before the execution of the several agreements referred to, said "Bullis and Barse pretended and represented to the said firm of I. B. Newcombe & Co. that the said 30,000 acres of land were timbered, free and clear of all incumbrances, and contiguous and adjacent to the line of the defendant railroad company, as the same was then constructed and projected, and that said land was covered by a large quantity of merchantable timber, which would be sufficient to and would actually provide said railroad with at least 70 tons of freight to the acre, for conveyance over said railroad at rates from 25 to 50 cents per ton, in addition to the percentage accruing to said defendant railroad company from divisions with other lines;" further that, before said agreements were entered into at the request of Bullis and Barse, engineers were sent from New York to inspect the timber on the land to be conveyed to said trustee; that "they were escorted through certain timber lands" .by said Bullis, and the lands through which they "were escorted by said Bullis were heavily timbered," and that said Bullis "stated that said lands were to be placed under said mortgage" to said trustee, and a report in accordance with this statement was made by said engineers, and upon this report said Newcombe & Co. "embarked in the enterprise, and entered into said scheme of consolidation and extension"; that said lands so "defined and pointed out by said Bullis were worth from $18 to $20 an acre"; again that said Bullis and Barse "had stated and represented to Newcombe & Co." that the mortgage was to be a first lien, the lands to be well timbered and "contiguous and tributary to said lines of railroad"; that said trust mortgage was approved and accepted in the belief that said representations were true in fact, and that Bullis and Barse were "in good faith performing their said covenants." The court further found:

"(93) That the statements and representations of said defendants Bullis and Barse with respect to said timber lands, mentioned and referred to in

said Exhibits 'A,' 'B,' and 'C,' and Schedule 'A' annexed to the complaint, were fraudulent, and made with intent to deceive. (94) That the plaintiff was in fact deceived by said statements and representations. (95) That said statements and representations were false and untrue. (96) That said agreement was in fact fraudulently made with respect of the lands agreed to be conveyed by said Bullis and Barse." That a great part of the lands included in the deed were not the property of Bullis, and the value of that owned by him and not timbered was $13,350, while that apparently covered by the deed, but not owned by him, was worth $175,502.77, and a considerable part of that included in the conveyance was incumbered.

In the conclusions of law the court decides it has "jurisdiction to proceed in this cause, by reason of the fraud practiced by the defendants Bullis and Barse in the premises," and by the "fact that the plaintiff has been deceived by the fraudulent statements and misrepresentations of the defendants." It directed "immediate specific performance" by them by their conveying to the trust company "30,000 acres of land free and clear of all incumbrances, and contiguous and tributary to the lines of the railroad of the defendant * * * timbered and profitable to said defendant railroad company, and of the market value of at least $18 per acre." Finally, the court directs and decides:

"That the defendants Spencer S. Bullis and Mills W. Barse at once pay to the Central Trust Company of New York the sum of $.'92,125.00, with interest thereon at the rate of 5 per cent. per annum from the 1st day of February, 1892, for the pro rata benefit of the plaintiff, James R. O'Beirne, and all other holders of the first mortgage bonds of the defendant the Allegany & Kinzua Railroad Company."

The judgment entered upon this decision was affirmed. O'Beirne v. Bullis, 2 App. Div. 545, 38 N. Y. Supp. 4; Id., 158 N. Y. 466, 53 N. E. 211.

The action for specific performance in the strictest sense thereof was founded upon the actual positive fraud of the defendants Bullis and Barse. They had in fact, in pretended compliance with their agreements, conveyed to the designated trustee 30,000 acres of land. The plaintiff alleged that the defendants fraudulently included in this conveyance lands not owned by the grantors and that the bulk of the tract was not timber land, was incumbered, and was not adjacent to the railroad lines described. Lands so located, and with heavy growing timber, had been shown to the engineers selected to inspect it, and a conveyance to a trustee of the lands represented was sought by the action. The gist, the intrinsic ingredient, of the action was consequently the fraudulent scheme,—the false representations of these defendants. As was said by the court of appeals in its first review of the case (151 N. Y., at page 384, 45 N. E. 876): "The theory of the complaint and the tendency of the proof upon the trial were that a fraudulent scheme was devised by Bullis and Barse." Jurisdiction was held to exist in the court of equity to award damages in lieu of decreeing specific performance in case the proof disclosed the inability to enforce a precise compliance with the agreements. When it developed upon the second trial that specific performance was unavailing, the trial court retained jurisdiction to proceed "by reason of the fraud practiced by the defendants Bullis and Barse." The backbone of the action, whether viewed

strictly as one in equity, or for damages in lieu of equitable relief to compensate the bondholders for the misconduct of the defendants, was the fraud of the latter. As we interpret subdivision 2 of section 17 of the bankrupt law it does not limit the exception to common-law actions of fraud or deceit. The gist and gravamen of the action must have been the positive and intentional fraud of the bankrupt. The record presented must clearly show that such misconduct was the pith of the action, and it may not be dependent upon oral proof or other evidence outside of the record. There are many authorities construing the kindred section of the bankrupt law of 1867 (section 33), which provided "that no debt created by the fraud or embezzlement of the bankrupt * * * shall be discharged under this act." In Strang v. Bradner, 114 U. S. 555, 5 Sup. Ct. 1038, 29 L. Ed. 248, the discharge in bankruptcy was interposed to an action charging false and fraudulent representations made by one member of a copartnership, which included the defendants, who were not cognizant of the representations made. The court held that the fraud of the copartner was imputable to the other members of the firm, and in defining the fraud, which was within the purview of the section quoted, decided that it "should be construed to mean positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, and not implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality." The same principle was reiterated, and the authorities analyzed, in Forsyth v. Vehameyer, 177 U. S. 177, 20 Sup. Ct. 623, 44 L. Ed. 723, and the court, at page 182, 177 U. S., page 625, 20 Sup. Ct., and page 725, 44 L. Ed., thus defines the representation which constitutes a fraud:

"A representation as to a fact, made knowingly, falsely, and fraudulently, for the purpose of obtaining money from another, and by means of which such money is obtained, creates a debt by means of a fraud involving moral turpitude and intentional wrong. It is not necessary to enlarge upon the subject. It is so plainly a fraud of that description that its mere statement obtains our ready assent."

In the authorities which I have examined no stress is laid upon the form of the action. While an action of fraud to the mind of a lawyer signifies the common-law action of fraud or deceit, the wording of the subdivision under discussion evidently was not framed with that precise remedy in view. The expression "judgments in actions for frauds" conveys no such signification as that mentioned, and may include any positive intentional fraud which was the basis of a judgment and was of the substance of the recovery. The statute is to be construed liberally to discharge the insolvent from the burden of the obligations which he is unable to pay in full, but that liberality may not be extended to an insolvent to release him from a judgment which was recovered against him by reason of his "positive fraud and intentional wrong," whatever may have been the form of the action in which the recovery was had. The primary purpose of the statute is to enable an insolvent debtor to be relieved from the burden of his obligations. One exception that has pervaded all of our bankrupt laws is that, where the insolvent has become

liable for the payment of a debt which had its origin in his own positive dishonesty, the way is not open for his discharge from that liability. In one instance proof that the debt was created by fraud was sufficient to raise the barrier; in another, the debt must have ripened into judgment, but in each case the fraudulent misconduct is the basis of the prohibition, not the technical form which the indebtedness has assumed. As was said in Coll. Bankr. (3d Ed.) at page 197:

"The fact that the judgment was in an action for fraud, or willful or malicious injury, may, perhaps, not appear by the judgment itself. That is not necessary; it is sufficient if it appear from the record of the case. If the record show that the action was for any of the causes specified, then the judgment is not barred by a discharge. The action must have been based on the fraud or the willful or malicious injury. It is not enough that there may have been incidental or immaterial false and fraudulent representations in connection with the transaction, if the action is not based on them."

And also at page 202:

"The debt, as we have seen under subdivision 2, § 17, Bankr. Law 1898, is not released by a discharge, although in the form of a judgment. But the record must show that the debt is so created. If a judgment is rendered in an action, the record of which shows material, traversable allegations of fraud, which were necessarily determined, then the judgment is conclusive."

In Re Lewensohn (D. C.) 99 Fed. 73, Justice Brown says:

"In cases of this kind no purely technical considerations as to the precise form of the action should be regarded."

In Burnham v. Pidcock, 58 App. Div. 273, 68 N. Y. Supp. 1007, the action in which the judgment was recovered was for conversion. Neither the judgment nor anything in the record showed that fraud or fraudulent representations were an essential element of the cause of action, although the court, in its opinion, stated the act which constituted the conversion was fraudulent. The court held that the nature of the action must be gathered from the record, instead of from any extrinsic source. The court uses this language at page 275, 58 App. Div., page 1009, 68 N. Y. Supp.:

"The judgments which are excepted from the effect of a discharge in bankruptcy are, as it is expressed in the statute, judgments for fraud. The phrase means that the fraud is the gravamen of the action in which the judgment is recovered, and that proof of the fraud is essential to the right of recovery. It does not include a judgment in which, the right of recovery is based upon an act which is not essentially fraudulent, although in that action fraud may be incidentally shown."

That case is not an authority which is helpful to the appellant. In the present case the record shows that fraud was the marrow of the cause of action, and the sole ground for retaining jurisdiction and awarding damages was the fraudulent conduct of Bullis and Barse. No resort need be had to extraneous proof to show that fraud was not an incident, but the vital factor, in the action. The findings of fact passed upon by the trial judge are minute and circumstantial, and abound in facts from which the turpitude and deceit of the defendants are established. These findings are supplemented by conclusions of law, and the whole followed by the formal judgment, which bears the signature of the justice presiding, so that the record consists of the decision and judgment made by the jus-

tice himself, and forming one complete document. We think the respondent is not concluded because he elected to proceed by suit in equity. He did not base his cause simply upon breach of contract, but on the fraud of Bullis and Barse, and emphasis is given to that element in the various appeals. The court, in its opinion in 80 Hun say, at page 573, 30 N. Y. Supp., page 590: "That the facts found * * * conclusively show that Spencer S. Bullis and Mills W. Barse perpetrated an atrocious fraud." The court of appeals (158 N. Y. 466, 53 N. E. 211), in discussing its previous decision, observe, at page 468, 158 N. Y., page 211, 53 N. E.:

"The theory upon which the decision proceeded was that they devised a fraudulent scheme for the consolidation of certain railroads owned and controlled by them, issued bonds upon false representations as to the timber lands to be furnished as added security under the mortgage to make the bonds secure and salable; that upon those facts the court would have been justified in granting relief to the plaintiff against them."

With the fraud of the petitioner so marked a constituent in the record of which the judgment is a part, we are constrained to hold that he is not entitled to the cancellation of the judgment, as it is within the prohibition of subdivision 2 of section 17, referred to.

The counsel for the respondent devotes much space in his brief to an argument that subdivision 4 of section 17 applies to this appeal. The position is that the terms "fraud, embezzlement, misappropriation," in that subdivision, relate to an individual, while the word "defalcation" alone applies to one "acting as an officer or in a fiduciary capacity." We cannot assent to that construction. In the corresponding section (33) of the act of 1867, the interpretation contended for may have been tenable. In the present section, however, the exceptions have been remodeled and reclassified, and the intention apparently was to make subdivision 2 applicable to frauds, etc., perpetrated by an individual failing debtor, but protected him by limiting the prohibition against his discharge to frauds, false representations, etc., embodied in a judgment and provable by the record. Subdivision 4 was then designed to relate to an officer, or one acting in a trust capacity, and was enlarged in its scope by erecting a barrier to the discharge of such a culpable debtor who had been guilty of "fraud, embezzlement, misappropriation" as well as "defalcation." A person faithless in a public or trust capacity is the more flagrant malefactor, and hence it may have been deemed advisable to extend the barrier to his receiving the benefit of a discharge permitted by the statute to include the other delinquencies named. The natural rendition of subdivision 4, as well as its grammatical construction, seems to favor this interpretation. If any debt created by fraud, embezzlement, or misappropriation is to be excepted from the application of the statute, then there is no necessity of subdivision 2 making a judgment essential to prevent the granting of the discharge under the statute. The bare proving the debt was created by fraud would be sufficient to raise a bar to the release of the insolvent therefrom, which would be tantamount to emasculating subdivision 2. We conclude, however, that the petitioner is barred by subdivision 2 from obtaining the cancellation

of the judgments, and that the order of the special term should therefore be affirmed, with $10 costs.

The order is affirmed, with $10 costs and the disbursements of this appeal. All concur.